IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHY D. WILEY, | ) |
|       Plaintiff, | ) |
| v. | ) No. 14-CV-09077 |
| ELISABETH LUDEMAN CENTER & DHS, | ) Judge John J. Tharp, Jr. |
|       Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Kathy Wiley sued her former employer, the Elisabeth Ludeman Center and the Illinois Department of Human Services (which runs the Ludeman Center), for sexual harassment and retaliation under Title VII. The Department moved for summary judgment as to all claims. Wiley voluntarily waived her claims for sexual harassment,[1] so all that remains are her retaliation claims. As discussed below, Wiley has failed to demonstrate an adverse employment action, so the motion for summary judgment is granted.

## BACKGROUND[2]

At all times relevant to this action, Kathy Wiley was an employee of the Illinois Department of Human Services ("the Department"). *See* Def.'s Statement of Facts ("DSOF") ¶ 2, ECF No. 37. Wiley was a Mental Health Technician at the Department's Elisabeth Ludeman Center, which is "a live-in facility that provides services for people with mental and physical disabilities." *Id.* at ¶ 3. Technicians are typically assigned to a specific house and shift, although they are reassigned to different houses with some frequency (Wiley, for instance, was moved at

---

[1] Resp. at 2 n.1, ECF 50.

[2] Undisputed facts are taken from the plaintiff and defendant's statements of fact. The facts are viewed in the light most favorable to Wiley as the non-movant and all inferences are drawn in her favor. *See Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008).

least eleven times between 2002 and 2008). *Id*. at ¶ 4. Technicians are "responsible for the well-being of the individuals" in their house, typically working in teams of two to three technicians for each ten or eleven patients. *Id*. at ¶ 5-6. Technicians can also be assigned to the Health Center on any given day as a part of their ordinary job duties. *Id.* at ¶ 7. The Health Center is where house residents go when they are ill, and a technician's job remains the same when their patient is in the Health Center. *Id*. at ¶ 8. A technician typically begins each workday by confirming whether they will be going to their assigned house or "pulled" to a different house or the Health Center depending on the organization's needs that day. *Id*. at ¶ 9. A technician is sometimes assigned to the Health Center because one of her house's patients has been temporarily moved to the Health Center. *Id*. at ¶ 16. Supervisors typically try to assign Health Center patients to technicians who are already familiar with them. Pl.'s Statement of Additional Facts ("PSOF") ¶ 11, ECF No. 52.

Wiley's claims arise from an incident that occurred in her assigned house on February 3, 2013, when she alleges a fellow technician sexually harassed her. DSOF ¶ 12-13. This technician, Alex Caulker, was assigned to the same house as Wiley. *Id*. at ¶ 12. Wiley first attempted to report the harassment to a supervisor on February 8, 2013, but she was "never able to get it out" explicitly. *Id.* at ¶ 20-22. The next day she was at work, February 11, 2013, she went to Cynthia Dear, a Unit Director at the Ludeman Center, and reported the harassment. *Id*. at ¶ 24-27. Dear asked Wiley what she would like her to do, and Wiley responded she did not want to work with Caulker any longer. *Id.* at ¶ 27. Dear agreed, and told Wiley she would be reassigned and would not have to work in that house or work with Caulker. *Id*. at ¶ 28. Dear instructed Caulker not to speak with Wiley, and began the process of moving Caulker to a different shift so that he would not work during Wiley's shifts. *Id*. at ¶ 31-35. Wiley and Caulker

never worked together again and did not have any further contact. *Id*. at ¶ 36. The Ludeman Center conducted two separate investigations of the incident, while the Illinois State Police conducted another. *See id.* at ¶ 55, 65-76.

Wiley was immediately assigned to the Health Center for two weeks. DSOF ¶ 37. Dear told Wiley it would take a week or so to get Wiley assigned to a new house. *Id*. at ¶ 38. During that time, Wiley was assigned to work at the Health Center with a patient from her previously assigned house. *Id*. at ¶ 40. On February 18, 2013, a week after she reported the harassment, Wiley received an assignment to work at a new house starting in two weeks (March 3, 2013). *Id*. at ¶ 39. At no time did Wiley's title, pay, or hours change. *Id*. at ¶ 42. However, Wiley stopped working at the Ludeman Center on February 22,[3] before her reassignment to her new house could take effect. *Id*. at ¶ 49. On March 28, 2013, she filed a charge of discrimination with the Equal Employment Opportunity Commission alleging sex discrimination and retaliation. *Id*. at ¶ 77-78. Wiley filed this lawsuit on November 12, 2014 after her right to sue letter was issued on September 12, 2014. *See* EEOC Letter, ECF No. 37, Ex. 1 at 16.

Wiley found the Health Center to be "unfavorable" because she was unable to do enjoyable activities with her patients, such as offsite trips and time in the gym. *Id.* at ¶ 47-48. She was unable to do these activities because she was assigned to assist only the particular ill patient in the Health Center during those days. She does not allege that other Health Center employees caring for similarly ill patients were allowed to participate in such activities.[4]

---

[3] The defendant's statement of facts indicated that Wiley's last day was February 22, *2015*, which is clearly incorrect if she never began her March 2013 assignment. Thus, the Court assumes this is typo and should indicate February 22, 2013.

[4] Wiley makes a point of citing to testimony from Alex Caulker that following the alleged harassment, Caulker still attended "group activities" where staff would "hang out during work and after work." PSOF ¶ 18. Reviewing the cited testimony, it appears Caulker is referring to organized activities intended to benefit the Ludeman Center's patients, and not unofficial social

Wiley further alleges that some of her coworkers mistreated her. DSOF ¶ 50. One technician stopped speaking to her, while another told Wiley it was her fault the colleague had been "moved around," and a third said she didn't "know who to believe" or didn't believe Wiley. *Id.* at ¶ 50-53. Wiley further alleges that other technicians pointed their fingers, laughed, and whispered around her, although Wiley did not know their names. *Id.* at ¶ 54.

## DISCUSSION

Summary judgment may be granted to the Department only "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law" when all facts are construed in favor of the non-movant. *Lapka v. Chertoff,* 517 F.3d 974, 981 (7th Cir. 2008). Title VII prohibits retaliation against any person because she "has opposed any practice made an unlawful employment practice by this title, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3. The parties agree informing her supervisor about the sexual harassment was a charge under Title VII.

A retaliation claim under Title VII can be proved directly or indirectly. For a direct showing, Wiley must demonstrate "(1) [she] engaged in statutorily protected expression; (2) [she] suffered an adverse action at the hands of [the defendant]; and (3) there was a causal link between the two." *Jajeh v. County of Cook*, 678 F.3d 560, 569 (7th Cir. 2012). "Under the indirect method, the first two elements remain the same, but instead of proving a direct causal link, the plaintiff must show that [she] was performing [her] job satisfactorily and that [she] was treated less favorably than a similarly situated employee who did not complain of discrimination." *Stephens v. Erickson*, 569 F.3d 779, 786-87 (7th Cir. 2009). Both methods

---

events exclusively with coworkers. Caulker stated he did not see Wiley attend these activities, and that he did not feel treated differently by his co-workers. *Id.* at ¶ 19.

4

require an adverse employment action, and the Department contends Wiley has not suffered such an action as a result of either her reassignment to the Health Center or as a result of her coworkers' comments.

Title VII "does not set forth a general civility code for the American workplace" and "does not protect an employee from trivial harms, petty slights, nor minor annoyances." *Id*. at 790. An action taken by an employer only qualified as an "adverse action" if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. Actions are considered objectively, although the context and circumstances of the particular facts inform that determination. *See id*. With this standard in mind, the Court addresses each of Wiley's alleged adverse actions.

**A. Wiley's Reassignment to the Health Center**

Wiley's first alleged adverse employment action was being assigned to the Health Center "for at least two weeks straight" and, as a result, not being able to engage in movie nights and off-site trips with other patients. *See* Pl.'s Mem. at 3-4, ECF No. 50. Wiley "enjoyed" these activities with other patients and objects to the "duration" of her "isolated" time in the Health Center. *Id*. at 4. Wiley does not allege that her presence at the Health Center was in any way unnecessary or that another technician would not have been required had she not been assigned to the Health Center.

Generally, a reassignment or transfer is considered an adverse action if it "significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted" or if "the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Nagle*

*v. Village of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009). For example, being reassigned from being a forklift operator to a track laborer is adverse when the laborer job is "by all accounts more arduous and dirtier," while the forklift job required more qualifications and was considered more prestigious. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 71 (2006). However, a police officer being assigned a senior liaison position is not adverse, even if no one applied for the job, if the position needed to be filled by someone in the department. *See Nagle,* 554 F.3d at 1120. Nor is a policeman being assigned from patrol duty to a stationary position at a strip mall adverse. *See id*. Nor is it adverse for an officer worker to be assigned only more difficult and time-consuming cases or for a scientist to be moved from an interesting supervisory job to a boring lab work job with no supervisory role. *See Lapka,* 517 F.3d at 986; *Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th Cir. 2000).

Here, Wiley's pay, title, and hours were not impacted by her transfer to the Health Center. DSOF ¶ 42. Working in the Health Center was a normal duty sometimes assigned to all technicians, including Wiley, and the day to day job responsibilities in the Health Center were "largely the same" as those in the regular houses. *Id*. at ¶ 8-9. Although Wiley wrote in her affidavit[5] that employees were not usually assigned to the Health Center for consecutive days, she does not assert that the Health Center was more arduous, humiliating, unsafe, or required fewer skills than her regular job. *See* PSOF ¶ 4. In fact, Cynthia Dear (the Unit Director) indicated she believed being assigned to the Health Center would be a better assignment than leaving Wiley to "float," where she would change assignments daily and not know where she would work for several weeks. *See* Dear Dep. 91:4-92:1 Dec. 10, 2015, ECF No. 52 Ex. D.

---

[5] The Department objects to Wiley's use of an affidavit as unsupported by personal knowledge. *See* Def.'s Reply at 2, ECF No. 53. However, it seems possible Wiley may have some personal knowledge of the staffing practices of her employer given her long employment there.

Regardless, Wiley's reassignment did not result in a *significant* change in responsibilities, as it would need to in order to qualify as an adverse employment action. *See Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009). The reassignment would likely not be adverse even if it had been a permanent or indefinite change (the cases cited earlier by this Court involved permanent or otherwise indefinite reassignments). However, Wiley's change is particularly insignificant because Wiley was aware this was a temporary situation that would last only a matter of weeks. *See* DSOF ¶ 38. *See, e.g., Schmidt v. Canadian Nat. Ry. Corp.*, 232 F. App'x 571, 575 (7th Cir. 2007) (citing employee's failure to adduce evidence "that his *temporary* reassignment . . . was less prestigious or more difficult than his ordinary duties") (emphasis in original); *Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 903 n.1 (7th Cir.2002) ("temporary change in job responsibilities" not an adverse employment action absent a significant diminishment of material responsibilities). Although Wiley disputes whether this time was actually needed to change the scheduling, she does not dispute that she was told it would only be for a short period of time and that she was in fact reassigned back to her preferred type of assignment a week later. *See id*. at ¶ 38-39. The mere fact that Wiley was required to spend a few weeks performing a job, within her job requirements and largely identical to her regular job tasks, that she found less enjoyable than her regular tasks does not render the assignment an actionable adverse action. Therefore, the motion for summary judgment is granted as to the reassignment claim.[6]

---

[6] Even if Wiley had shown an adverse employment action, which she has not, the Department would still be entitled to summary judgment because it has put forth a non-discriminatory reason for moving her – separating her from her alleged abuser. Although Wiley suggests Caulker should have been moved rather than her, Title VII "doesn't guard against unwise or unfair decisions unless those decisions also were discriminatory or retaliatory." *Place v. Abbott Labs.*, 215 F.3d 803, 811 (7th Cir. 2000). Separating the two employees, on a temporary basis, until they can both be placed back in similar non-interacting roles after an

7

**B. Coworker Comments**

Wiley's second claim is that her coworkers retaliated against her by pointing and whispering and a few stray comments. Harassment by coworkers can constitute an adverse action if it causes "a significant change in the plaintiff's employment status." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). For example, a campaign of frequent coworker harassment in which individuals called her a "fucking bitch," said they would "get her" and "make her life hell" was an actionable adverse action. *Knox v. Indiana*, 93 F.3d 1327, 1335 (7th Cir. 1996). On the other hand, being ostracized by coworkers is insufficient, as is having a supervisor refuse to speak to you. *See Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998); *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 555 (7th Cir. 2000). Similarly, a supervisor telling an employee that the employee "had to go," that they should not work together, and that the supervisor "could not forgive" the employee for her lawsuit was "too petty and tepid to constitute a material change." *Stutler*, 263 F.3d at 704.

Here, Wiley says that she was subjected to pointed fingers, laughter, and whispering by unknown coworkers, as well as statements from three fellow technicians. DSOF ¶ 51-54. With inferences taken in Wiley's favor, a statement that a coworker doesn't "know who to believe" or that it was Wiley's "fault" she had been moved could be upsetting, but falls well short of harassment that even arguably compromised her work environment in a material way. Although Wiley says in her affidavit that she began to experience "stress and anxiety" as a result of the harassment, this is not sufficient for the harassment to rise to the level of a significant change in employment. *See* PSOF ¶ 33. Her coworkers were impolite and in some instances unkind, but

---

accusation is a valid non-retaliatory explanation for the Department's behavior. Wiley has produced no evidence to suggest this separation was not in fact the reason for her transfer, other than a suggestion that Caulker should have been moved based on a previous non-harassment dispute he had with another worker several years before. *See* PSOF ¶ 20.

Wiley does not assert that they prevented her from doing her job or in any way threatened her. Wiley's colleagues appear to have continued to work with her to whatever extent was necessary for her to complete her duties.[7] To be actionable, harassment must cause a significant change in employment status, but it does not appear Wiley's employment was affected in any meaningful way. Because the harassment was not significant enough to constitute an adverse employment action, the motion for summary judgment is granted as to the coworker claim as well.

Because she has not suffered an adverse employment action, the Department is entitled to summary judgment on her retaliation claims as a matter of law. Having waived her sexual harassment claims, Wiley has no remaining claims in this suit and judgment will be entered.

Dated: July 12, 2017

John J. Tharp, Jr.
United States District Judge

---

[7] Wiley recalled two occasions on which she was unable to take a scheduled unpaid lunch break because a supervisor was unable to find a technician to cover for her. DSOF ¶ 43-45. However, Wiley does not allege this was a part of the harassment by her coworkers and does not mention the lunch incident at all in her response brief.